**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Jennifer O'CONNOR,<br><br>    Plaintiff,<br><br>vs.<br><br>ROMAN CATHOLIC CHURCH OF THE DIOCESE OF PHOENIX,<br><br>    Defendant. | No. CV 05-1309 PHX- SMM<br><br>**ORDER** |

The following motions are pending before the Court: (1) a Motion for Partial Summary Judgment filed by Plaintiff Jennifer O'Connor ("Plaintiff") (Dkt. 52); a Motion for Summary Judgment filed by Defendant the Roman Catholic Diocese of Phoenix ("Defendant") (Dkt. 56); and, (3) a Motion to Strike filed by Defendant (Dkt. 62).

## I. BACKGROUND

**A. Factual History**

The following facts are undisputed.

Defendant employed Plaintiff as a Youth Protection Advocate ("YPA") from May 12, 2003 to January 7, 2005. (Dkt. 53 at ¶ 27; Dkt. 64 at ¶¶ 14,15) The YPA position was a newly created position that came into being after the United States Conference of Catholic Bishops adopted the "Essential Norms for Diocesan/Eparchial Policies Dealing with Allegations of Sexual Abuse of Minors by Priests or Deacons" ("Essential Norms") in 2002. (Dkt. 53 at ¶¶ 12-15; Dkt. 64 at ¶¶ 5-12) The Essential Norms were created to ensure that each diocese would have procedures in place to respond to sexual abuse allegations. (Dkt. 53 at 14; Dkt 64 at 11)

Pursuant to the Essential Norms, each diocese was required to "designate a competent person to coordinate assistance for the immediate pastoral care of persons who claim to have been sexually abused when they were minors by priests or deacons." (Dkt. 53 at 15; Dkt. 64 at 12). This 'competent person' became known as the Victim Assistance Coordinator or, in this case, the YPA. (*Id.*)  Among other things, the YPA was required to be "[a]n active practicing Catholic who is in full communion with the Church." (Dkt. 53 at ¶¶ 30, 84, 85 and Ex. E; Dkt. 64 at ¶ 19) This requirement was stated in the Job Description that was provided to Plaintiff prior to her interview with Defendant. (Dkt. 53 at ¶ 30 and Ex. E; Dkt 64 at ¶ 19)

Shortly before she was terminated, Plaintiff was actively assisting a certain victim of sexual abuse and disagreed with the way Defendant was handling this victim's case. (Dkt. 53 at ¶ 87; Dkt 64 at ¶ 124)

Plaintiff married outside the Catholic Church on December 24, 2004. (Dkt. 53 at ¶ 87; Dkt 64 at ¶ 110) On January 7, 2005, the Diocese terminated O'Connor because she was no longer in full communion with the Catholic Church on account of her marriage. (Dkt. 53 at ¶ 85; Dkt. 64 at ¶ 113)

Bishop Thomas J. Olmstead, the Bishop responsible for overseeing the Roman Catholic Diocese of Phoenix, testified that a marriage without proper validation is a serious contradiction of the Church's teachings and laws on marriage. (Dkt. 64 at ¶ 117)

**B. Procedural History**

Plaintiff commenced this action on May 2, 2005, alleging claims for retaliation in violation of Title VII of the Civil Rights Act of 1964 ("Title VII") and wrongful termination in violation of A.R.S. § 23-15-1(3)(b). On January 31, 2006, the Court held a Preliminary Pretrial Conference in this matter. Both parties agreed that, as an initial matter, the Court should resolve certain constitutional issues before proceeding to the discrimination claims. Those constitutional issues as well as a statutory issue are now pending before the Court.

On September 14, 2006, Plaintiff moved for Partial Summary Judgment, asking the Court to determine, as a matter of law, whether she was subject to the "ministerial exception" of Title VII. (Dkt. 52)  Defendant moved summary judgment on September 15, 2006, arguing

1 that Plaintiff's Complaint should be dismissed on both statutory and constitutional grounds.
2 (Dkt. 56) Additionally, Defendant filed a Motion to Strike certain paragraphs from Plaintiff's
3 Statement of Facts in Support for Partial Summary Judgment ("SOF"). (Dkt. 62)
4    The motions are now fully briefed and ready for the Court's disposition.

## II. STANDARD OF REVIEW

6   A court must grant summary judgment if the pleadings and supporting documents,
7 viewed in the light most favorable to the nonmoving party, "show that there is no genuine
8 issue as to any material fact and that the moving party is entitled to judgment as a matter
9 of law." FED. R. CIV. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986);
10 *Jesinger v. Nevada Federal Credit Union*, 24 F.3d 1127, 1130 (9th Cir. 1994).
11 Substantive law determines which facts are material. *See Anderson v. Liberty Lobby*, 477
12 U.S. 242, 248 (1986); *see also Jesinger*, 24 F.3d at 1130. "Only disputes over facts that
13 might affect the outcome of the suit under the governing law will properly preclude the
14 entry of summary judgment." *Anderson*, 477 U.S. at 248. The dispute must also be
15 genuine, that is, the evidence must be "such that a reasonable jury could return a verdict
16 for the nonmoving party." *Id.*; *see Jesinger*, 24 F.3d at 1130.
17   A principal purpose of summary judgment is "to isolate and dispose of factually
18 unsupported claims." *Celotex*, 477 U.S. at 323-24. Summary judgment is appropriate
19 against a party who "fails to make a showing sufficient to establish the existence of an
20 element essential to that party's case, and on which that party will bear the burden of
21 proof at trial." *Id.* at 322; *see also Citadel Holding Corp. v. Roven*, 26 F.3d 960, 964 (9th
22 Cir. 1994). The moving party need not disprove matters on which the opponent has the
23 burden of proof at trial. *See Celotex*, 477 U.S. at 323-24. The party opposing summary
24 judgment need not produce evidence "in a form that would be admissible at trial in order
25 to avoid summary judgment." *Id*. at 324. However, the nonmovant "may not rest upon
26 the mere allegations or denials of [the party's] pleadings, but . . . must set forth specific
27 facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *see*
28

*Matsushita*, 475 U.S. at 585-88; *Brinson v. Linda Rose Joint Venture,* 53 F.3d 1044, 1049 (9th Cir. 1995).

### III. DISCUSSION

The Court will address the pending motions in the following order. Plaintiff's Motion for Partial Summary Judgment was filed a day before Defendant filed its Motion for Summary Judgment. Because the preclusive nature of Section 702 of Title VII, 42 U.S.C. § 2000e-1 (2000), a central issue raised in Defendant's Motion for Summary Judgment, has the potential to terminate this matter in its entirety, the Court will address Defendant's motion first.[1]

**A.    Defendant's Motion for Summary Judgment**

Offering both statutory and constitutional arguments, Defendant requests that the Court dismiss each of Plaintiff's claims as a matter of law. Following the inquiry set forth by the Supreme Court in *NLRB v. Catholic Bishop of Chicago*, the Court must first determine whether the dispute may be resolved on statutory grounds before considering Defendant's constitutional arguments. 440 U.S. 490 (1979). "[A]n Act of Congress ought not be construed to violate the Constitution if any other possible construction remains available." *Catholic Bishop*, 440 U.S. at 500.

Under the two-part analysis of *Catholic Bishop*, the Court must first determine whether the proposed application of Title VII would give rise to serious constitutional questions. *Catholic Bishop*, 440 U.S. at 501; *EEOC v. Pacific Press Publishing Ass'n.*, 676 F.2d 1272, 1276 (9th Cir. 1982). If it would, then the Court must next determine whether Congress clearly expressed an intent that Title VII be applied to this kind of decision. *Catholic Bishop*, 440 U.S. at 501; *Pacific Press*, 676 F.2d at 1276. The parties agree that applying Title VII to the employment practice before the Court would give rise to serious

---

[1] Defendant's Motion to Strike challenges the admissibility of certain paragraphs contained in Plaintiff's SOF. (Dkt. 62) As indicated *supra* in the Factual History, the Court has not deemed any of the disputed paragraphs relevant to ruling on the issues at hand.

- 4 -

constitutional questions. (Dkt. 60 at 4; Dkt. 56 at 4-7)  Thus, the Court's inquiry is limited to the second part of the *Catholic Bishop* analysis: whether Congress clearly expressed an intent to apply Title VII to this set of facts.

In enacting Title VII of the 1964 Civil Rights Act, Congress declared that discrimination by an employer on the basis of an individual's race, color, religion, sex or national origin is prohibited. *See* 42 U.S.C. § 2000e-2 (2000).  Yet, Congress also recognized that religious groups have a constitutionally protected interest in applying religious criteria to some employment decisions; therefore, Title VII has always contained an exception that allows religious employers to discriminate on the basis of religion. Section 702 of Title VII, 42 U.S.C. § 2000e-1 (2000) ("the §702 exemption"), provides the limited exception available to religious employers:

> This subchapter shall not apply ... to a religious corporation, association, educational institution or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution or society of its activities...

The §702 exemption is not, however an absolute bar to litigation.  In interpreting this section, the Ninth Circuit has previously stated:

> .... the legislative history of this exemption shows that although Congress permitted religious organizations to discriminate in favor of members of their faith, religious employers are not immune from liability for discrimination based on race, sex, national origin, or for retaliatory actions against employees who exercise their rights under the statute.

*Pacific Press*, 676 F.2d at 1276.  The Ninth Circuit added, "[t]he legislative history shows that Congress consistently rejected proposals to allow religious employers to discriminate on grounds other than religion." *Id*. at 1277.  Thus, the critical inquiry is whether Defendant's decision to terminate Plaintiff involved the application of religious doctrine or tenets of faith.

Relying on the Ninth Circuit's holding in *Pacific Press*, Plaintiff argues that the §702 exemption does not apply here because this is a retaliation case and religious organizations are not immune from liability for retaliatory employment actions.

- 5 -

1   According to Plaintiff, Defendant did not terminate her employment because she married
2   outside of the Church; rather, she was terminated because Defendant took exception to
3   the assistance she provided a sexual harassment victim.  Defendant, however, posits that
4   Plaintiff's position involves matter of religious faith since she the YPA was required to be
5   "[a]n active practicing Catholic ... in full communion with the Church." (Dkt. 64 at ¶ 19)
6   As such, Defendant argues that the undisputed facts reveal that Plaintiff's termination falls
7   well within the §702 exemption.
8       Religious organizations "are not immune from liability for ... retaliatory actions against
9   employees who exercise their rights under [Title VII]." *Pacific Press*, 676 F.2d at 1276.
10  However, when a religious organization provides a religious justification for an
11  employment action, the Ninth Circuit has stated that the organization will be exempt from
12  Title VII if it presents "convincing evidence" that the employment practice favored
13  members of one faith over another. *EEOC v. Fremont Christian School*, 781 F.2d 1362,
14  1366 (9th Cir. 1986) ("if, for example, a religious institution were to present 'convincing
15  evidence' that an employment practice favored members of one faith ... over another, §
16  702 deprives the EEOC of jurisdiction to investigate further to determine whether the
17  religious discrimination was a pretext for some other form of discrimination" (citation
18  omitted)).
19      The undisputed facts, construed in Plaintiff's favor, are as follows.  The YPA was
20  required to be "[a]n active practicing Catholic who is in full communion with the
21  Church."  In keeping with her duties as YPA, Plaintiff actively assisted a victim of sexual
22  abuse and disagreed with the way Defendant was handling this victim's particular case.
23  Plaintiff married outside the Catholic Church on December 24, 2004.  On January 7,
24  2005, the Diocese terminated O'Connor because she was no longer in full communion
25  with the Catholic Church due to her marriage outside the Church.
26      In light of the inquiry set forth in *Fremont Christian* and the undisputed evidence that
27  the YPA was required to be an active, practicing Catholic in full communion with the
28  Church, the Court finds that Defendant's decision to terminate Plaintiff constitutes the

1   type of religious discrimination permitted under the §702 exemption.  The undisputed
2   evidence demonstrates that Defendant required the YPA to be in full communion with the
3   Church and that Plaintiff understood and acknowledged this requirement; thus, the Court
4   finds that Defendant has exceeded the "convincing evidence" standard articulated in
5   *Fremont Christian*.  Were there no evidence that the YPA was required to be in full
6   communion with the Church, then this case would stand in a different posture and pretext
7   might be an issue.  However, the fact that Plaintiff disagreed with the way Defendant was
8   handling a sexual abuse victim's particular case is irrelevant in light of the fact that her
9   job required that she be in full communion with the Church and the fact that she breached
10  this requirement by marrying outside of the Church.  The requirement of being in full
11  communion with the Church, which entails marrying in accordance with Catholic
12  Church's teachings regarding the Sacrament of Marriage, is a matter of religious doctrine
13  insulated from the adjudicatory or interpretive powers of the Court by the First
14  Amendment of the Constitution. *See Bollard v. California Province of the Society of*
15  *Jesus*,196 F. 3d 940, 946 (9th Cir. 1999) (providing that the Free Exercise Clause of the
16  First Amendment prohibits courts from "adjudicating matters that necessarily require it to
17  decide among competing interpretations of church doctrine").
18      Moreover, *Pacific Press* - the case Plaintiff relies heavily upon to support her
19  argument– is factually distinguishable from the present case.  In *Pacific Press*, a female
20  editorial secretary employed by a religious publishing house, brought a claim for sex-
21  based discrimination under Title VII due to discriminatory wage scales. *Pacific Press*,
22  676 F.2d 1272.  Upon learning of the lawsuit, the Church affiliated with the publishing
23  house called for the secretary's termination because it felt her decision to file charges
24  demonstrated a failure to adhere to the high standards of Biblical teachings and church
25  authority. *Id*., 676 F.2d at 1275.  When the publishing house terminated the secretary
26  pursuant to the Church's recommendation, she added an additional claim for retaliation.
27  *Id*.  Unlike *Pacific Press*, the religious justification for the employment decision in the
28  present matter was not created after Plaintiff was hired.  Here, the reason used to justify

- 7 -

1  the employment decision was a condition of Plaintiff's employment, condition contained
2  in the job description provided to Plaintiff before she accepted the job.  Moreover, unlike
3  *Pacific Press*, Defendant did not terminate Plaintiff for participating in a lawsuit.  Here,
4  Plaintiff was terminated because she was no longer in communion with the Church due to
5  marriage.  Therefore, the Court does not find *Pacific Press* to be analogous to the present
6  case in light of the significant factual differences between the two.

7  The §702 exemption allows religious employers to discriminate in favor of members of
8  their own faith.  As Plaintiff's job description unequivocally demonstrates, being an active
9  practicing Catholic in full communion with the Church was a required term of her
10 employment.  Determining whether a particular marriage conforms with the Catholic
11 Church's teachings on marriage and whether an individual is in full communion with the
12 Church are clearly matters of religious interpretation.  Accordingly, the Court finds that
13 Defendant is exempt from liability under Title VII pursuant to the § 702 exemption and
14 Plaintiff's retaliation claim will be dismissed with prejudice.

15 **B.     Count Two of Plaintiff's Complaint**

16 In Count Two of her Complaint, Plaintiff alleges a claim for wrongful termination in
17 violation of A.R.S. § 23-1501(3)(b).  Plaintiff premises her wrongful termination claim on
18 A.R.S. § 23-1501(3)(b), which prohibits an employer from terminating an employment
19 relationship in violation of a statute of Arizona.  Plaintiff contends that the Diocese's
20 decision to terminate her for marrying outside the Church violated A.R.S. § 25-124(A),
21 which authorizes duly licensed or ordained clergymen to perform marriages in Arizona,
22 because she was lawfully married pursuant to this statute.  Bishop Thomas J. Olmstead,
23 the Bishop responsible for overseeing the Roman Catholic Diocese of Phoenix, testified
24 that a marriage without proper validation is a serious contradiction of the Church's
25 teachings and laws on marriage. (Dkt. 64 at ¶ 117).

26 Apart from a mere footnote stating that the *Catholic Bishop* analysis applies equally to
27 Plaintiff's state law claim, Defendant offers no arguments addressing the merits of the
28 claim.  In light of this omission, the Court declines to consider whether the claim runs

- 8 -

1 afoul of the Constitution or is precluded by the § 702 exemption. However, having
2 determined that Plaintiff's federal claim must be dismissed, the Court will decline to
3 exercise supplemental jurisdiction over Plaintiff's wrongful termination claim pursuant to
4 28 U.S.C. § 1367(c)(3).

5     The lack of subject matter jurisdiction may be raised by the court *sua sponte* at any
6 stage in the proceeding. "Nothing is to be more jealously guarded by a court than its
7 jurisdiction" because '[j]urisdiction is what its power rests upon." *In re Mooney*, 841 F.2d
8 1003, 1006 (9th Cir. 1988), overruled on other grounds, *Partington v. Gedan*, 923 F.2d
9 686 (9th Cir. 1991). Under § 1367(c)(3), a district court may decline to exercise
10 jurisdiction over a claim if it has dismissed all claims over which it has original
11 jurisdiction. Because the Court has determined that Plaintiff's Title VII claim must be
12 dismissed, it will decline to exercise jurisdiction over Plaintiff's wrongful termination
13 claim.

14     Having dismissed each count of Plaintiff's Complaint, the Court will dismiss this
15 matter with prejudice and deny the remaining motions as moot.

## IV. CONCLUSION

17     The § 702 exemption allows religious employers to make employment decisions on the
18 basis of religion. Thus, Defendant, as a religious employer, was entitled to require the
19 YPA to be "in full communion with the Church." What constitutes being "in full
20 communion with the Church" is clearly a matter of religious interpretation. As such, the
21 Court finds that Defendant's decision to terminate Plaintiff fits squarely within the § 702
22 exemption. Therefore,

23     **IT IS ORDERED** that Defendant's Motion for Summary Judgment (Dkt.56) is
24 **GRANTED** and Plaintiff's Complaint (Dkt. 1) is dismissed **WITH PREJUDICE** as
25 follows:

26     (1)    Plaintiff's Retaliation Claim (Count I) is dismissed on
27         the merits.

28

1     (2)    Plaintiff's Wrongful Termination Claim (Count II) is dismissed for lack of
2             subject matter jurisdiction pursuant to 28 U.S.C. § 1367(c)(3).

3   **IT IS FURTHER ORDERED** that Plaintiff's Motion for Partial Summary
4 Judgment(Dkt. 52) is **DENIED AS MOOT**.

5   **IT IS FURTHER ORDERED** that Defendant's Motion to Strike (Dkt. 62) is
6 **DENIED AS MOOT.**

7   **IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment
8 accordingly.

9   DATED this 23rd day of May, 2007.

Stephen M. McNamee
United States District Judge

- 10 -